# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 24, 2014         Decided June 12, 2015

No. 13-5235

COUNCIL FOR UROLOGICAL INTERESTS,
APPELLANT

v.

SYLVIA MATHEWS BURWELL, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN
SERVICES AND UNITED STATES OF AMERICA,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00546)

*Gordon A. Coffee* argued the cause for appellant. With
him on the briefs were *Thomas L. Mills*, *Steffen N. Johnson*,
and *Erica E. Stauffer.*

*Jeffrey E. Sandberg*, Attorney, U.S. Department of
Justice, argued the cause for appellees. With him on the brief
were *Stuart F. Delery*, Assistant Attorney General, *Ronald C.
Machen Jr.*, U.S. Attorney, and *Michael S. Raab*, Attorney.
*Christine N. Kohl*, Attorney, entered an appearance.

Before: HENDERSON, ROGERS, and GRIFFITH, *Circuit Judges*.

Opinion for the Court on Parts I, II.A, III, IV, and V filed by *Circuit Judge* GRIFFITH.

Opinion for the Court on Part II.B filed by *Circuit Judge* HENDERSON.

Opinion dissenting from Part II.A filed by *Circuit Judge* HENDERSON.

Opinion dissenting from Part II.B filed by *Circuit Judge* GRIFFITH.

I

The Secretary of Health and Human Services issued regulations that effectively prohibit physicians who lease medical equipment to hospitals from referring their Medicare patients to these same hospitals for outpatient care involving that equipment. The regulations accomplish this through two separate provisions. The first prohibits physicians from charging hospitals for leased equipment on a per-use basis when the physicians also refer patients to the hospital for procedures using that equipment. The second interprets the relevant statute to apply to physician-groups that perform procedures rather than only the entities that bill Medicare. Challenging the regulations here is an association of physicians who participate in leasing agreements with hospitals, under which they charge hospitals for equipment on a per-use basis and perform the procedures using the equipment. The association argues that the regulations exceed the Secretary's statutory authority and violate both the Administrative Procedure Act and the Regulatory Flexibility Act. The district court granted the Secretary's motion for summary judgment. Although one majority agrees with the

district court that the statute is ambiguous as to the regulation of leases that charge on a per-use basis (Part II.A), a different majority concludes that the Secretary's explanation for prohibiting these leases is unreasonable (Part II.B). The court unanimously concludes that the Secretary's interpretation of the statute to apply to the physician-groups performing the procedures is reasonable (Part III), and that the Secretary complied with the Regulatory Flexibility Act (Part IV). We therefore affirm in part, reverse in part, and remand to the district court with instructions to remand the regulation relating to leases charging by use to the Secretary for further proceedings.

A

This case involves the interplay between complicated statutory provisions and regulations. Resolving the questions before us requires that we undertake a sometimes arduous journey through the tangled regime. We begin our slog with a look at the Medicare program.

Medicare provides federally funded health insurance to disabled persons and those aged 65 or older for various services, including the outpatient hospital procedures at issue here. 42 U.S.C. §§ 1395 *et seq*. In addition to paying the performing physician a fee that covers her services for the outpatient care, *see generally* 42 U.S.C. §§ 1395w-4, 1395x(s)(1); 42 C.F.R. §§ 410.20, 414.32, Medicare also pays the hospital a fee that covers charges for space, equipment, supplies, diagnostic testing, and the services of any non-physician personnel, 42 U.S.C. § 1395*l*(t); 42 C.F.R. pt. 419. Typically a hospital will have an employee perform the outpatient procedures using its own equipment, but Medicare also permits hospitals to contract with third parties

to provide such outpatient services. *See* 42 U.S.C. § 1395x(w)(1); 42 C.F.R. § 410.42(a). Under these agreements, the third party provides equipment and technicians for a procedure while the hospital provides space and support services, pays for the lease of the equipment, and bills Medicare.

The members of the association challenging the regulations here have just this kind of relationship with hospitals. These arrangements are attractive to them because Medicare reimburses outpatient procedures that take place in hospitals at higher rates than if they were performed elsewhere.[1] *Compare* 42 C.F.R. § 419.2(b) (listing eighteen categories of costs Medicare covers for outpatient hospital procedures), *with* 42 C.F.R. § 416.61(a) (listing eight

---

[1] For example, in 2010, the base Medicare reimbursement rate for outpatient hospital prostate laser surgery was $3,138.81, 75 Fed. Reg. 45,988 (Aug. 3, 2010), whereas the same procedure in an ambulatory surgical center was reimbursed at $1,720.77, *id.* at 45,843. According to the hospitals, the higher rates are necessary to subsidize their less profitable but necessary services, such as emergency departments and trauma care. *See Keeping the Promise: Site-of-Service Medicare Payment Reforms: Hearing before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 113th Cong. 146-47 (2014) (statement of Reginald W. Coopwood, Chief Executive Officer, Regional One Health, on Behalf of the American Hospital Association). Even so, last year the Office of the Inspector General released a report recommending that Medicare eliminate this disparity by reducing outpatient payment rates. *See* DEP'T OF HEALTH & HUMAN SERVS., OFFICE OF INSPECTOR GEN., MEDICARE AND BENEFICIARIES COULD SAVE BILLIONS IF CMS REDUCES HOSPITAL OUTPATIENT DEPARTMENT PAYMENT RATES FOR AMBULATORY SURGICAL CENTER-APPROVED PROCEDURES TO AMBULATORY SURGICAL CENTER PAYMENT RATES 5, 7-8 (2014), http://oig.hhs.gov/oas/reports/region5/51200020.pdf.

categories of costs Medicare covers in ambulatory surgical centers).

This disparity creates a financial incentive for physicians to make referrals based more on maximizing their income than on maximizing the Medicare patient's well-being. For example, suppose a physician has an ownership interest in a hospital laboratory that diagnoses various illnesses. The physician profits by sending his Medicare patient to that hospital to undergo the diagnostic tests. The patient, by contrast, has little financial incentive to limit the cost of the tests, as Medicare covers most of the costs. This imbalance in interests can lead to a physician ordering a battery of unnecessary tests. In fact, a 1991 study showed this very outcome where Florida physicians had ownership interests in diagnostic clinics. *See Joint Ventures Among Health Care Providers in Florida: Hearing Before the H. Subcomm. on Health of the H. Comm. on Ways and Means*, 102d Cong. (1991). To address this problem, Congress enacted the Stark Law (named for former Representative Pete Stark of California). *See generally* 42 U.S.C. § 1395nn; *see also* Medicare and Medicaid Programs; Physician's Referrals to Health Care Entities With Which They Have Financial Relationships, 63 Fed. Reg. 1659, 1718 (proposed Jan. 9, 1998). The Stark Law places restrictions on both the referring physicians and the hospitals. It prohibits a physician who has a "financial relationship" with a hospital from referring Medicare patients to that hospital.[2] It also bars hospitals from

---

[2] The Law lists twelve specific "designated health services" for which referrals are prohibited. These include clinical laboratory services, physical therapy services, occupational therapy services, radiology services, radiation therapy, durable medical equipment and supplies, parenteral and enteral nutrients, prosthetic devices and supplies, home health services, outpatient prescription drugs,

receiving Medicare payments based on these prohibited referrals. *See* 42 U.S.C. § 1395nn(a)(1)(A), (a)(1)(B), (h)(6)(K). For the Stark Law's purposes, a physician has a "financial relationship" with a hospital if she owns or invests in it, or if she has a compensation agreement with the hospital covering services, equipment, and the like. *Id.* § 1395nn(a)(2)(A)-(B), (h)(1).

Despite the general prohibition on potentially self-interested referrals, the Stark Law permits referrals by physicians to entities in which they have a financial interest in certain limited circumstances. It does so by excluding some forms of compensation agreements and ownership interests from the definition of "financial relationship," thus allowing both the relationships and the referrals. *See* 42 U.S.C. § 1395nn(b)-(e). The provision at issue here is the equipment rental exception, under which physicians may both lease equipment to a hospital and refer their Medicare patients to that hospital for procedures using the equipment so long as the leasing agreement meets certain conditions. The lease must (1) be in writing; (2) assign use of the equipment exclusively to the hospital; (3) last for a term of at least one year; (4) set rental charges in advance that are consistent with fair market value and "not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties"; (5) satisfy the standard of commercial reasonableness even absent any referrals; and (6) meet "such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse." 42 U.S.C. § 1395(e)(1)(B)(i)-(vi).

---

inpatient and outpatient hospital services, and outpatient speech-language pathology services. 42 U.S.C. § 1395nn(h)(6).

In 1998, the Secretary proposed a rule that would prevent a physician with an ownership interest in a group that leased equipment and performed procedures under contract with a hospital from referring Medicare patients to the hospital for those procedures. The proposed rule accomplished this by adopting a broader interpretation of the statutory language that prevents physicians from referring Medicare patients to an entity "for the furnishing of designated health services" when the physician and the entity have a financial relationship. 42 U.S.C. § 1395nn(a)(1)(A). Specifically, the proposed rule expanded the definition of an entity "furnishing" such services. The previous definition included only the party billing Medicare, usually the hospital where the procedures were performed. The new rule would extend to the party performing the procedures, including the third parties that contracted to perform outpatient procedures in hospital facilities. 63 Fed. Reg. at 1706. The proposed rule also altered the equipment rental exception by banning leases that charged the hospital for each use of the equipment—also referred to as leases with "per-click" payments—for patients referred by the physician-lessor. *Id*. at 1714.

To give an example of the regulatory scheme at work, prior to the proposed regulations, a single doctor could own laser equipment that she leased to a hospital, refer patients to that hospital for laser procedures, and profit each time the laser equipment was used. Because Medicare gives greater reimbursements for procedures performed at hospitals than for those same procedures performed in physicians' offices, it would be more profitable for a doctor to enter into such arrangements with a hospital than it would be for the doctor to purchase the laser for use in her own office. The Secretary's proposal forbade this practice. While a doctor could still own

laser equipment and lease it to the hospital to which she referred her patients, she would only be permitted to receive time-based payments from the hospital, such as yearly or monthly charges. The frequency of laser usage would have no bearing on the doctor's profit, so she would no longer have a financial incentive to refer patients to the hospital for laser procedures. By the same token, a physician with an ownership interest in a group that leased laser equipment and performed laser procedures under contract with a hospital could no longer refer patients to the hospital for such procedures.[3]

After considering comments, the Secretary decided against including either of these proposed alterations in the rule promulgated in 2001. Instead, the final rule provided that an entity is "furnishing designated health services" only if it is the entity that actually bills Medicare for the services. *See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Relationships, 66 Fed. Reg. 856, 943 (Jan. 4, 2001). Physicians with an ownership interest in a group that contracted with a hospital could continue to refer patients to the hospital because any such groups performing the procedures and supplying the equipment were not billing Medicare. The 2001 rule also continued to allow leases with per-click payment terms. *Id*. at 876. Even so, the preamble to the regulation explained that the Secretary continued to be concerned that contractual arrangements between physician-owned groups and hospitals "could be used to circumvent" the Stark Law, *id*. at 942, and also recognized the "obvious potential for abuse" in per-click payments, *id*. at 878. In both cases, the Secretary advised that

---

[3] That is, unless an ownership exception applies. *See* 42 U.S.C. § 1395nn(d).

she would monitor the arrangements and reconsider the decision if necessary. *Id*. at 942, 860.

That reconsideration came in 2007 with another notice of proposed rulemaking. The Secretary again proposed banning per-click leases and forbidding physicians from making referrals to hospitals for procedures to be performed by a group practice in which the physician has an ownership interest. *See* Medicare Program; Proposed Revisions to Payment Policies, 72 Fed. Reg. 38,122 (proposed July 12, 2007). This time, the Secretary adopted both proposed regulations with minimal changes in 2008. *See* Medicare Program; Changes to Disclosure of Physician Ownership in Hospitals and Physician Self-Referral Rules, 73 Fed. Reg. 48,434 (Aug. 19, 2008). According to the new rule, an entity that either performs or bills for designated health services is considered to be "furnishing" such services, meaning that physicians with ownership interests in groups that perform outpatient services in hospitals cannot refer patients for the procedures. *See* 42 C.F.R. § 411.351. With respect to the equipment rental exception, the rule states that the lease may not use per-click rates. 42 C.F.R. § 411.357(b)(4)(ii)(B). Thus, under the regulations challenged here, a physician-owned group that contracts to lease equipment to a hospital cannot do so on a per-click basis while referring patients to that hospital for procedures using the equipment. Nor can a physician with an ownership interest in the group refer patients for outpatient procedures in a hospital where the group performs the procedures, unless she qualifies for one of the narrow ownership exceptions. *See, e.g.*, 42 U.S.C. § 1395nn(d)(2) (exempting rural providers).

B

The Council for Urological Interests is made up of a group of joint ventures principally owned by urologists. These joint ventures lease laser technology to hospitals. Urologists generally prefer to furnish their services in a hospital because of the higher reimbursement rate available there. The Council contends that the lower rate paid for its members' services outside a hospital is insufficient to cover the cost of the equipment. Thus, to make the purchase of laser equipment economically viable, the urologists enter into agreements with a hospital, where the hospital pays the joint venture for the equipment on a per-click basis. The new regulation the Council challenges prohibits these arrangements.

C

The Council filed this action in March 2009, alleging that the 2008 rule exceeded the Secretary's authority under the Administrative Procedure Act (APA) and violated the procedural requirements of the Regulatory Flexibility Act (RFA). The Secretary moved to dismiss the complaint for lack of subject-matter jurisdiction, arguing that challenges to the regulation must be raised through the agency's administrative procedures before they can be raised in court. The district court granted the motion, but this court reversed. Because the statute only permits Medicare "providers" who bill Medicare to seek administrative review, the Council and other affected parties who provided services but did not bill Medicare lacked access to administrative review. Under these circumstances, we held that requiring the use of administrative procedures would result in the "complete preclusion of judicial review." *See Council for Urological Interests v. Sebelius*, 668 F.3d 704, 713-14 (D.C. Cir. 2011) (quoting *Shalala v. Ill. Council*

*on Long Term Care, Inc.*, 529 U.S. 1, 22-23 (2000)). On remand, the parties filed cross-motions for summary judgment. The district court granted the government's motion, concluding that the agency regulations were entitled to *Chevron* deference and that the agency's construction of the statute was a reasonable one. *See Council for Urological Interests v. Sebelius*, 946 F. Supp. 2d 91, 112 (D.D.C. 2013). The district court also rejected the Council's claims under the RFA, finding that the Council had conceded a crucial portion of the Secretary's argument by failing to provide a response. *See id*. The Council timely appealed both the APA and RFA claims. On appeal, the Council argues that the text and legislative history of the Stark Law preclude the Secretary from banning physicians who refer patients to a hospital from leasing equipment to that hospital on a per-click basis. The Council also argues that the Secretary unreasonably interpreted the statute to forbid physicians from referring patients to a hospital for procedures performed by a group in which the physician has an ownership interest. Finally, the Council argues that the Secretary failed to complete the requisite regulatory flexibility analysis called for by the RFA. We have jurisdiction under 28 U.S.C. § 1291.

"We review a grant of summary judgment *de novo* applying the same standards as those that govern the district court's determination." *Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997).

## II

When Congress gives an agency authority to interpret a statute, we review the agency's interpretation under the deferential two-step test set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837

(1984). *See Troy Corp.*, 120 F.3d at 283. At step one, to determine whether Congress has directly spoken to the precise question at issue, we use "the traditional tools of statutory interpretation." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (internal quotation marks omitted). If it is clear that Congress has addressed the issue, we give effect to congressional intent. If the statute is silent or ambiguous on the matter, we move to a second step that asks whether the agency's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. An interpretation is permissible if it is a "reasonable explanation of how an agency's interpretation serves the statute's objectives." *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005). If the agency's construction is reasonable, we defer. *See Chevron*, 467 U.S. at 842-43.

A

"We begin, as always, with the plain language of the statute in question." *Citizens Coal Council v. Norton*, 330 F.3d 478, 482 (D.C. Cir. 2003). The Council argues that the Stark Law expressly permits per-click rates for equipment rentals and that the Secretary thus lacked authority to ban per-click leases. The Council points to language in a clause of the equipment rental exception that permits equipment lease arrangements when "rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties." 42 U.S.C. § 1395nn(e)(1)(B)(iv). This rental-charge clause, the Council argues, means that per-click rates are necessarily permissible so long as they meet these requirements. Per-click charges pass muster, according to the Council, because a charge based on use can be set in advance

and be consistent with fair market value, and the charge would not take into account volume or value of referrals when the per-use charge is stable across the leasing period, rather than increasing after a certain number of uses. The Council is wrong. Its argument ignores the remaining requirements of the equipment rental exception. Importantly, the final clause states that the lease must also "meet[] such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse." 42 U.S.C. § 1395nn(e)(1)(B)(vi). The Secretary explicitly relied on this authority in promulgating the regulation forbidding per-click payments. *See* 42 C.F.R. § 411.357(b)(4)(ii)(B). Because any lease must comply with the listed rental charge requirements *and* any further requirements the Secretary adds, the fact that per-click leases comply with the rental charge requirements alone is insufficient. The text of the statute does not unambiguously preclude the Secretary from using her authority to add a requirement that bans per-click leases. *See* 42 U.S.C. § 1395nn(e)(1)(B). To the contrary, the statutory text of the exception clearly provides the Secretary with the discretion to impose any additional requirements that she deems necessary "to protect against program or patient abuse." *See id.* § 1395nn(e)(1)(B)(vi).

Nevertheless, the Council argues that because the statute's text already lists specific requirements for rental charges, the Secretary cannot add further requirements related to rental charges because these cannot properly qualify as "other" requirements under the final clause of the exception. The Council relies on *Financial Planning Ass'n v. SEC*, 482 F.3d 481 (D.C. Cir. 2007), which involved a statute regulating investment advisers. The statute defined the category of regulated investment advisers broadly to include any person who is paid to advise others regarding securities. 15 U.S.C.

§ 80b-2(a)(11). The statute then exempted several categories of persons from regulation and gave the SEC authority to exclude "such other persons not within the intent of this paragraph, as the Commission may designate." *Id.* § 80b-2(a)(11)(H).[4] One of the statutory exemptions applied to broker-dealers who gave investment advice incidental to their normal business activities and "receive[d] no special compensation therefor." *Id.* § 80b-2(a)(11)(C). The SEC issued a final rule that broadened the exemption for broker-dealers to apply even when they did receive special compensation. We held that this rule violated both limitations on the SEC's rulemaking authority: The rule was outside the intent of the statute because the text already provided an exemption for broker-dealers and there was no intent that the exemption's reach should be broadened. Moreover, because broker-dealers were already specifically addressed in the statutory text, they did not constitute "other persons." *See Financial Planning*, 482 F.3d at 488. The Council argues that the outcome should be the same here. We disagree. The Secretary does not face the same limitations on her rulemaking authority as did the SEC in *Financial Planning*. The Stark Law gives the Secretary power to add requirements "as needed to protect against program or patient abuse," even if Congress did not anticipate such abuses at the time of enactment. While Congress may not have originally intended the ban of per-click leases, it empowered the Secretary to make her own assessment of the needs of the Medicare program and regulate accordingly. And, as distinct from the statute in *Financial Planning*, the text of the Stark Law makes no reference to per-click rates. In other words, the statute

---

[4] At the time we decided *Financial Planning*, this portion of the statute appeared at 15 U.S.C. § 80b-2(a)(11)(F). It has since been amended.

explicitly permits the Secretary to impose additional conditions on equipment rental agreements and nowhere expressly states that per-click rates are permitted. Thus, the Secretary's regulation can properly be classified as an "other" requirement.

The Secretary's freedom to ban per-click leases is all the more clear when the equipment rental exception is compared to other provisions within the Stark Law. For example, the statute elsewhere expressly permits charging per-click fees in other contexts, showing that Congress knew how to authorize such payment terms when it wanted to. In 42 U.S.C. § 1395nn(e)(7)(A) Congress created an exception to the Stark Law that allows the continuation of certain group practice arrangements with a hospital. Under the Law, a group practice is defined to include a group of physicians who join together to perform the full range of medical services in one office, billing Medicare under one provider number. *See* 42 U.S.C. § 1395nn(h)(4).[5] The provision states that "[a]n arrangement between a hospital and a group under which designated health services are provided by the group but are billed by the hospital" is excepted from the ban on referrals if, among other things, "the compensation paid over the term of the agreement is consistent with fair market value and the compensation *per unit of services* is fixed in advance and is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties." *Id*.

---

[5] As the Council acknowledges, the kinds of joint ventures its members form do not qualify as group practices. These joint ventures are formed solely to purchase and lease equipment and cannot bill Medicare on their own. Physicians forming group practices actually perform substantially all of their medical services within that group and have their own provider number. 42 U.S.C. § 1395nn(h)(4).

§ 1395nn(e)(7)(A)(v) (emphasis added). Comparing this provision to the equipment rental exception shows that Congress knew how to permit per-click payments explicitly, suggesting that the omission in this particular context was deliberate. *Cf. Central Bank of Denver v. First Interstate Bank, N.A.*, 511 U.S. 164, 176-77 (1994). In other words, Congress's decision not to include similar language in the equipment rental exception supports our conclusion that the statute is silent regarding the permissibility of per-click leases for equipment rentals.

Yet another provision of the Stark Law shows that Congress knew how to limit the Secretary's authority to impose additional requirements to the various exceptions. In 42 U.S.C. § 1395nn(e)(2), Congress excludes bona fide employment relationships from the definition of compensation arrangements. This provision states that the employment relationship must comply with various requirements, including that the pay not be determined "in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." This employment exception also allows the Secretary to impose "other requirements," just as the equipment rental exception. *Id*. But the statute then goes on to say that the listed requirements "shall not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician." *Id*. This language shows that Congress knew how to cabin the Secretary's authority to impose "other" requirements and that it knew how to further clarify what it meant by compensation that does not take into account the volume of business generated between parties. That Congress employed neither of these tools with reference to the equipment rental exception

again supports reading the statute as giving the Secretary broad discretion as she regulates in this area.

The Council next argues that even if the text is ambiguous, the legislative history makes plain that the Secretary must allow per-click leases. The Council points to a portion of the House Conference Report which explains, in reference to the rental-charge clause of the equipment rental exception, that "[t]he conferees intend that charges for space and equipment leases may be based on . . . time-based rates or rates based on units of service furnished, so long as the amount of time-based or units of service rates does not fluctuate during the contract period." H.R. REP. NO. 103-213, at 814 (1993). This expression of congressional intent should, the Council thinks, bind the Secretary's hands here and forbid the new regulation.

In *Catawba County, N.C. v. EPA*, we stated that "a statute may foreclose an agency's preferred interpretation despite such textual ambiguities if its structure, legislative history, or purpose makes clear what its text leaves opaque." 571 F.3d 20, 35 (D.C. Cir. 2009). But we then went on to hold that the legislative history at issue there did not even come close to providing the clarity necessary to decide the case at step one. *See id*. So too here. The conference report the Council points to states only that rental charges "may" be based on units of service. The language is not obligatory.[6] Instead, it simply

---

[6] Judge Henderson argues that Congress is not required to use obligatory language to limit an agency's discretion. It is true that courts should not presume a delegation of power anytime such power is not withheld. But we make no such presumption here. Congress has expressly delegated to the Secretary the authority to promulgate additional requirements, as she has done here, and the

indicates that, as written, the rental-charge clause does not preclude per-click leases. But, as we have already explained, there is more to the statute than this clause, and to qualify for the exception, a rental agreement must comply with all six clauses, not merely the rental-charge clause alone. The final clause gives the Secretary the authority to add further requirements. Nothing in the legislative history suggests a limit on this authority. We conclude that the statute does not unambiguously forbid the Secretary from banning per-click leases as she evaluates the needs of the Medicare system and its patients.[7]

B

The per-click ban falters, however, at *Chevron* step two. Although *Chevron*'s second step largely "overlaps" with arbitrary-and-capricious review under the APA, *Nat'l Ass'n of Reg. Util. Comm'rs v. ICC*, 41 F.3d 721, 726 (D.C. Cir. 1994), the overlap is not complete. We primarily assess the agency's

---

legislative history does not clearly impose a constraint on that power.

[7] Judge Henderson likewise errs in equating Congress's intent for the original rental-charge clause to allow per-click leases with an intent to preclude the Secretary from creating an additional requirement banning them. But the rental-charge clause, read with the legislative history, states only that rental charges for equipment leases must not be "determined in a manner that takes into account the volume or value of any referrals" and that per-click leases do not "take[] into account the volume" of patient referrals. *See* 42 U.S.C. § 1395nn(e)(1)(B)(iv); H.R. REP. NO. 103-213, at 814. A statement that per-click charges are not precluded by the statutory clause as it is written is not equivalent to a statement that the Secretary must continue to permit such charges as she reevaluates, in light of experience, the operation of the statute.

statutory interpretation to determine whether it is a "permissible" and "reasonable" view of the Congress's intent. *Chevron*, 467 U.S. at 843–44; *see also Cont'l Air Lines, Inc. v. DOT*, 843 F.2d 1444, 1449 (D.C. Cir. 1988) (*Chevron* step two is determined "by reference both to the agency's textual analysis (broadly defined, including where appropriate resort to legislative history) and to the compatibility of that interpretation with the Congressional purposes informing the measure"); *Nat'l Ass'n of Reg. Util. Comm'rs*, 41 F.3d at 727 ("although *Chevron*'s second step sounds closely akin to plain vanilla arbitrary-and-capricious style review, interpreting a statute is quite a different enterprise than policy-making" (quotation marks and ellipsis omitted)). In making this assessment, we look to what the agency said at the time of the rulemaking—not to its lawyers' post-hoc rationalizations. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *see also Bus. Roundtable v. SEC*, 905 F.2d 406, 417 (D.C. Cir. 1990) (*Chenery* principle applies to *Chevron* statutory analysis).

In the preamble to the per-click ban, the Secretary identified the 1993 Conference Report as an important locus of statutory interpretation. *See* 73 Fed. Reg. at 48,715. This is unsurprising as the Secretary felt completely bound by the Conference Report in 2001. *See* 66 Fed. Reg. at 878 ("given the clearly expressed congressional intent in the legislative history, we are permitting 'per use' payments"). The Secretary now believes the Conference Report is ambiguous but her explanation in the 2008 rulemaking borders on the incomprehensible. According to the Secretary:

> Where the *total amount of rent* (that is, the rental charges) over the term of the lease is directly affected by the number of patients referred by one party to the other, those rental charges can arguably be said to . . . "fluctuate during the contract period based on" the volume or value of referrals between the parties. Thus, . . . the Conference Report can reasonably be interpreted to exclude from the space and lease exceptions leases that include per-click payments for services provided to patients referred from one party to the other.

73 Fed. Reg. at 48,716 (emphasis added) (quoting H.R. REP. NO. 103-213, at 814). This jargon is plainly not a reasonable attempt to grapple with the Conference Report; it belongs instead to the cross-your-fingers-and-hope-it-goes-away school of statutory interpretation. The Conference Report makes clear that the "units of service *rates*" are what cannot "fluctuate during the contract period," not the lessor's total rental *income*. H.R. REP. NO. 103-213, at 814 (emphasis added). The Secretary's interpretation reads the word "rates" out of the Conference Report entirely. If a "reasonable" explanation is "the stuff of which a 'permissible' construction is made," *Northpoint*, 412 F.3d at 151, the Secretary's tortured reading of the Conference Report is the stuff of caprice.

On appeal, counsel for the Secretary minimizes the Conference Report, noting that its language does not appear in the statutory text and does not limit the Secretary's "other requirements" authority. *See* Appellee's Br. 28–29. We cannot consider this argument, however, because the Secretary did not articulate it during the 2008 rulemaking and, in fact, contradicted it by treating the Conference Report as a key interpretive roadblock. *See* 73 Fed. Reg. at 48,715. What is

left is the Secretary's bewildering statutory exegesis—one we cannot affirm even under *Chevron*'s deferential standard of review. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("*Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself . . . . For the courts to substitute their or counsel's discretion for that of the [agency] is incompatible with the orderly functioning of the process of judicial review."); *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 628 (1971) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").[8]

On this record, the per-click ban fails at *Chevron* step two. We remand 42 C.F.R. § 411.357(b)(4)(ii)(B) to the district court with instructions to remand to the Secretary for further proceedings consistent with this opinion. On remand, the Secretary should consider—with more care than she exercised here—whether a per-click ban on equipment leases is consistent with the 1993 Conference Report.

---

[8] Judge Griffith believes the Council failed to make a *Chenery* challenge to the per-click ban. The Council's reply brief, however, argues that "the government makes no effort to defend HHS's position [articulated during the rulemaking process] on appeal." Appellant's Reply Br. 10. This assertion "implicitly raise[s] the *Chenery* issue," *Mitchell v. Christopher*, 996 F.2d 375, 378 n.2 (D.C. Cir. 1993), and is sufficient for us to consider it. *See id.* at 379; *accord Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1287–88 (10th Cir. 2007) (majority op.). Plainly, the Council did not need to raise a *Chenery* argument preemptively in its opening brief, before it knew whether the Secretary's litigation strategy would deviate from the reasoning she used during the rulemaking.

III

The Council also challenges the Secretary's new definition of an "entity furnishing designated health services," which expands the regulation to apply to joint ventures, like those the Council members participate in, that lease equipment and perform outpatient procedures under contract with hospitals. Under the 2008 regulations, physicians cannot have an ownership interest in a joint venture that leases equipment to a hospital and simultaneously refer patients to the hospital for procedures the physician performs using the leased equipment.[9] The Council concedes that there is sufficient ambiguity in this part of the statute to move to *Chevron* step two. The Council argues that the Secretary's definition nonetheless violates the APA because her definition renders another provision of the Stark Law superfluous, is not necessary to protect against abuse, and is impermissibly vague. We disagree.

As before, our deferential analysis under *Chevron* step two is limited to determining whether the regulation is rationally related to the goals of the Stark Law. *See Northpoint*, 412 F.3d at 151. Here, defining the "entity furnishing designated health services" to include the entity providing the services is a permissible construction of the statute. This is apparent from a simple reading of the statute

---

[9] There is an ownership exception. As explained previously, the statute provides exceptions applicable to compensation agreements, ownership interests, or both. The equipment rental exception is an exception for a compensation agreement created by an equipment lease. A physician with an ownership interest in a joint venture that contracts to perform services in a hospital would need to qualify for an ownership exception, like the one exempting rural providers. *See* 42 U.S.C. § 1395nn(d)(2).

itself: the terms "provide" and "furnish" are used interchangeably. *Compare* 42 U.S.C. § 1395nn(a)(2) (stating that an ownership or investment interest subject to the referral prohibition includes "an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service"), *with id.* § 1395nn(b)(3) (referring to "services furnished by an organization" under a prepaid plan); *see also id.* § 1395nn(e)(7)(A) (using "provided" and "furnished" to describe services rendered by a physician group practice operating under contract with a hospital). Moreover, this definition furthers the purpose of the statute by closing a loophole otherwise available to physician-owned entities that would allow circumvention of the purpose of the Stark Law merely by having the hospital bill Medicare for the services. *See* 73 Fed. Reg. at 48,724.

Despite the apparent reasonableness of defining a term by use of its synonym, the Council advances several arguments in an attempt to show that the regulation is arbitrary and capricious and therefore fails at *Chevron* step two. *See Northpoint*, 412 F.3d at 151. None is persuasive.

First, the Council argues that the Secretary's new definition of an "entity furnishing designated health services" is contrary to legislative intent because it deprives the exception for group practices of all effect. The Stark Law defines group practices to include groups of physicians who provide a full range of medical services "through the joint use of shared office space, facilities, equipment and personnel." 42 U.S.C. § 1395nn(h)(4)(A)(i). The statute permits certain group practices that operated under contract with hospitals prior to the passage of the Law to continue to do so if specific conditions are met. *Id.* § 1395nn(e)(7). However, this special consideration extended to group practices only excludes the

financial arrangement from being considered a compensation agreement. Under the new rule, a group practice will now be considered an entity "furnishing" the services it performs under contract with the hospital. This means that physicians with ownership interests in the group practice will not be permitted to refer patients to hospitals for these procedures unless an ownership exception also applies.

The Council argues that requiring group practices to meet an ownership exception would render the original compensation exception meaningless. Not so. It is true that the new definition of "furnishes" significantly narrows the exception for group practices, but it hardly renders the group practice provision meaningless. For example, a group practice that qualifies as a rural provider can continue operating under contract with hospitals. *See* 42 U.S.C. § 1395nn(d)(2). Although this will not apply to all group practices, nothing in the statute suggests that the Secretary may not require a group to meet both an ownership exception and a compensation agreement exception. And even without an ownership exception, the group practice exception still allows employees with no ownership interest in the group practice to refer patients to a hospital where the group performs the procedures. Employees of a group practice are still involved in a compensation arrangement with a hospital, albeit an indirect one. *See* 42 U.S.C. § 1395nn(h)(1)(A) (defining a compensation arrangement as including "any arrangement involving any remuneration between a physician . . . and an entity"); 42 C.F.R. § 411.354(a)(2) (defining a financial relationship to include direct or indirect relationships). Because of this, absent an exception, the Stark Law would preclude the employees of a group practice from referring patients to the hospital. The group practice exception permits such employees to refer patients, rendering the exception

meaningful. The Council claims that there are already regulations providing exceptions for indirect compensation arrangements, resulting in a redundancy. *See* 42 C.F.R. § 411.357(p). But the principle of statutory interpretation advising courts to avoid surplusage only speaks to statutory language, not the content of regulations. *Cf. United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks omitted)).

Next, the Council argues that the new definition is not needed to prevent urologists from evading the Stark Law. The Council claims that the regulation of urological procedures is not within the purpose of the Stark Law because they are regulated only when they are performed as outpatient procedures in hospitals. The Council argues that this shows that Congress did not consider urological procedures susceptible to abuse. However, this argument misapprehends the purpose of the statute. The Stark Law is intended to prevent physicians' financial interests from affecting whether they refer patients for outpatient procedures and where the patient is referred. *See* 144 Cong. Rec. E4-03 (daily ed. Jan. 27, 1998) (statement of Rep. Stark) (noting that the Stark Law was "designed to reduce or eliminate the incentives for doctors to over-refer patients to services in which the doctor has a financial relationship"). That purpose is fulfilled by regulating third-party relationships with hospitals regardless of whether the underlying procedure itself would be categorized as a designated health service if performed elsewhere. Urologists who participate in joint ventures receive a greater financial benefit from Medicare when they perform the procedure in a hospital and they are therefore given an incentive to refer patients there. The extra compensation might deter the urologists from treating the patients elsewhere

or prescribing different treatments altogether. This incentive brings the procedures within the scope of the purpose of the Stark Law. The Secretary determined that defining "furnishes" to include only the entity billing Medicare would allow abusive practices to evade regulation. We find this determination reasonable.

Finally, the Council argues that defining "furnishes" to include an entity that "performs" the services is impermissibly vague. We disagree. The Secretary provided guidance on the meaning of the regulation within the preamble and gave examples as to where it would apply. *See* 73 Fed. Reg. at 48,726 (explaining that a physician performs a service "if the physician or physician organization does the medical work for the service and could bill for the service," but not where an entity merely "leases or sells space or equipment used for the performance of the service"); *see also Howmet Corp. v. EPA*, 614 F.3d 553-54 (D.C. Cir. 2010) (recognizing that an agency may provide "fair notice" of its interpretation through "published agency guidance"). Moreover, even if the precise contours of the definition are not clear, the Secretary "has authority to flesh out its rules through adjudications and advisory opinions." *Shays v. Fed. Election Comm'n*, 528 F.3d 914, 930 (D.C. Cir. 2008).

We therefore conclude that the Secretary's regulation redefining an "entity furnishing designated health services" is a reasonable construction of the statute that is entitled to deference.

IV

The Council argues that the promulgation of the 2008 rule violated the Regulatory Flexibility Act. Congress enacted

the Act in response to concerns with the burdens of federal regulation, especially on small businesses. *See* Paul R. Verkuil, *A Critical Guide to the Regulatory Flexibility Act*, 1982 DUKE L.J. 213. Although the Act does not require rules that are less burdensome for small businesses, agencies must explain why any such alternatives were rejected. 5 U.S.C. § 604(a)(6). This process is aimed at "assur[ing] that such proposals are given serious consideration." 5 U.S.C. § 601 app. at 124 (Supp. IV 1980). An agency implementing policy changes through rulemaking must complete an analysis—referred to as a regulatory flexibility analysis—of the rule's impact and publish it in the Federal Register along with the final rule. *See* 5 U.S.C. § 604(a). The analysis must contain several components, including a statement of the need for the rule, the agency's response to any significant comments, an estimate of the number of small entities to which the rule will apply, a description of the rule's compliance requirements, and a description of the steps the agency has taken to minimize the economic impact on small entities. *Id.* § 604(a)(1)-(6). Alternatively, an agency can forego this analysis "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b). The Secretary must publish the certification and its factual basis in the Federal Register. *Id.* The Secretary acknowledges that HHS did not perform a regulatory flexibility analysis of the 2008 rule; however, she argues that she properly certified that it will not have a significant impact on small businesses.

We agree that the Secretary's certification satisfied the RFA.[10] In the appendix to the larger rule that included the changes at issue here, the Secretary discussed each portion of the rule and stated that "the analysis discussed throughout the preamble of this final rule constitutes our final regulatory flexibility analysis." 73 Fed. Reg. at 49,063. In explaining the changes in regulating per-click charges and physicians' agreements to operate within hospitals, the Secretary stated that "[w]e do not anticipate these final policies will have a significant impact on physicians, other health care providers and suppliers, or the Medicare or Medicaid programs and their beneficiaries." *Id.* at 49,077. Although this statement nowhere uses the word "certify," that omission alone does not constitute a violation of the RFA. *See Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 467 (D.C. Cir. 1998) (upholding a certification as sufficient where the EPA stated only that the rule would "not have a significant adverse economic impact on a substantial number of small businesses"). And the preamble to the rule, which the Secretary incorporated as part of the analysis, fulfills the RFA's requirement that the Secretary include a statement providing a factual basis for her certification. The Secretary stated her belief that existing arrangements "can be restructured" to comply with new requirements. *See* 73 Fed. Reg. at 48,717, 48,733. Indeed, the Secretary delayed the effective date of the regulations "to afford parties adequate time to restructure arrangements." *Id.* at 48,714; *see also id.* at 48,721, 48,729. The Secretary's belief that entities could

---

[10] The district court held that the Council conceded the adequacy of the certification by failing to challenge the Secretary's argument at summary judgment. *See Council for Urological Interests*, 946 F. Supp. 2d at 112. We need not consider whether this treatment was appropriate because we hold that the certification was adequate in any event.

restructure and the provision of additional time to allow them to do so provides a factual basis for the certification.

The Council argues that the Secretary was incorrect in believing that existing arrangements could be "easily restructured." So long as the procedural requirements of the certification are met, however, this court's review is "highly deferential" as to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule. *See Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 438 (D.C. Cir. 2013). Because we find that the Secretary demonstrated a "reasonable, good-faith effort" to comply with the RFA's "[p]urely procedural" requirements, we uphold the certification as satisfactory. *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001) (internal quotation marks omitted).

V

The district court's order granting summary judgment to the Secretary is affirmed in part and reversed in part. We remand the per-click regulation to the district court with instructions to remand to the Secretary.

1

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting in part: In my view, the Congress unambiguously intended to authorize per-click equipment leases. I therefore do not believe the per-click ban, 42 C.F.R. § 411.357(b)(4)(ii)(B), satisfies the first step of *Chevron* and respectfully dissent from Part II.A of the majority opinion.

The Stark Law broadly prohibits self-referrals: if a doctor has a financial interest in an entity, he cannot refer patients to that entity for designated health services. 42 U.S.C. § 1395nn(a). Nevertheless, the Stark Law contains multiple exceptions. *Id.* § 1395nn(b)–(e). This case involves the equipment exception. *Id.* § 1395nn(e)(1)(B). A physician can lease equipment to an entity—and refer patients to it—if:

**(i)** the lease is set out in writing, signed by the parties, and specifies the equipment covered by the lease,

**(ii)** the equipment rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee when being used by the lessee,

**(iii)** the lease provides for a term of rental or lease of at least 1 year,

**(iv)** the *rental charges* over the term of the lease are set in advance, are consistent with fair market value, and *are not determined in a manner that takes into account the volume* or value *of any referrals* or other business generated between the parties,

**(v)** the lease would be commercially reasonable even if no referrals were made between the parties, and

**(vi)** the lease meets such *other requirements* as the Secretary may impose by regulation as needed to protect against program or patient abuse.

*Id.* (emphases added). The Centers for Medicare and Medicaid Services (CMS or Agency) relied on subsection (vi) to enact the per-click ban, which ban specifies that an equipment lease can no longer utilize "*[p]er-unit of service rental charges.*" 42 C.F.R. § 411.357(b)(4)(ii)(B) (emphasis added). The question is whether the CMS can use its "other requirements" authority to ban per-click leases. I think not.

An agency cannot use its delegated authority in a way that contradicts the Congress's unambiguous intent. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 134–35 (1990) ("Although the [agency] has both the authority and expertise generally to adopt new policies when faced with new developments in the industry, it does not have the power to adopt a policy that directly conflicts with its governing statute." (citation omitted)); *cf. AFL-CIO v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005) ("Even when Congress has stated that the agency may do what is 'necessary,' " the agency "cannot render nugatory restrictions that Congress has imposed." (citation omitted)). As a matter of first principles, an agency is not entitled to *Chevron* deference unless the Congress "has left a gap for the agency to fill." *Am. Bar Ass'n v. FTC*, 430 F.3d 457, 468 (D.C. Cir. 2005). If the Congress has "directly spoken" to the issue in question, there is no such gap. *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (*en banc*) (quoting *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842 (1984)); *see also Util. Air Reg. Grp. v. EPA*, 134 S. Ct. 2427, 2445 (2014) ("Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of

Congress." (quotation marks omitted)). An agency crosses an impermissible line when it moves from interpreting a statute to *rewriting* it. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite [a] statute."); *NRDC v. Adm'r, EPA*, 902 F.2d 962, 977 (D.C. Cir. 1990) ("It hardly bears noting that [the agency's] discretion cannot include the power to rewrite a statute and reshape a policy judgment Congress itself has made."), *vacated in other part*, 921 F.2d 326 (D.C. Cir. 1991). Even if the Congress wanted to authorize agency rewrites, the Constitution would stand in its way. *See Util. Air Reg. Grp.*, 134 S. Ct. at 2446 ("Under our system of government, Congress makes laws and the President, acting at times through agencies . . ., faithfully executes them." If agencies could "modify unambiguous requirements imposed by a federal statute," it "would deal a severe blow to the Constitution's separation of powers." (quotation marks and alteration omitted)); *see also id.* at n.8 ("[W]e shudder to contemplate the effect that such a principle would have on democratic governance.").

The CMS contends that it can always use its "other requirements" authority to *narrow* the scope of the equipment exception, prohibit *more* conduct and remain consistent with the Stark Law. But the Agency takes an overly simplistic view of congressional intent. Legislation is often the product of "compromise between groups with . . . divergent interests," reflecting a "careful balance" between two extremes. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93–94 (2002). "[A]gencies must respect and give effect to these sorts of compromises." *Id.* at 94. The Stark Law, for example, begins with a broad prohibition on physician self-referrals. *See* 42 U.S.C. § 1395nn(a). The bulk of the provision, however, consists of exceptions to that general ban. *See id.* § 1395nn(b)–(e); *see also* Steven D. Wales, *The Stark*

*Law: Boon or Boondoggle? An Analysis of the Prohibition on Physician Self-Referrals*, 27 LAW & PSYCHOL. REV. 1, 11 (2003) ("What cannot be done [under the Stark Law] is explained in one sentence. . . . Exceptions, however, fill nearly nine pages of the statute."). The exceptions reflect the Congress's judgment that certain arrangements are net beneficial to patients, regardless of the risks associated with self-referrals. *See United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 96 (3d Cir. 2009). Thus, when the CMS circumscribes a statutory exception to the Stark Law, it can do as much violence to the Congress's intent as when it broadens one. *See Am. Bankers Ass'n v. SEC*, 804 F.2d 739, 754 (D.C. Cir. 1986) (agency cannot "*change* basic decisions made by Congress" (emphasis added)); *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 615 (1983) (O'Connor, J., concurring in the judgment) ("[W]e would expand considerably the discretion and power of agencies were we . . . to permit [them] to proscribe conduct that Congress did not intend to prohibit.").

Moreover, the text of subsection (vi)—authorizing the CMS to promulgate "*other* requirements"—contains its own limitation. The word "other" means "existing besides, or distinct from, that already mentioned or implied." *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007) (quoting II THE SHORTER OXFORD ENGLISH DICTIONARY 1391 (2d ed. 1936, republished 1939)). The CMS cannot use its "other requirements" authority to "redefine" or "override" the statutory conditions set out in the equipment exception. *Id.* For example, subsection (iii) requires equipment leases to be "at least 1 year" long. 42 U.S.C. § 1395nn(e)(1)(B)(iii). The CMS plainly could not change "1 year" to "6 months" because such a regulation would redefine a statutory requirement, instead of adding a new one. *See Fin. Planning Ass'n*, 482 F.3d at 489 ("[C]ourts have hesitated to allow

[agencies] to use language structurally similar to the 'other [requirements]' clause . . . to redefine . . . specific requirements in existing statutory exceptions." (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 n.11 (1988)).

Applying these principles here, we first determine whether another provision of the equipment exception already addresses the propriety of per-click leases. Subsection (iv), which discusses *rent*, is the most natural candidate. Under subsection (iv), "the *rental charges* over the term of the lease" must not be "*determined in a manner that takes into account the volume* or value *of any referrals* or other business generated between the parties." 42 U.S.C. § 1395nn(e)(1)(B)(iv) (emphases added). The key inquiry, then, is whether the "rental charges" in a per-click lease "take[] into account the volume" of patient referrals. The per-click ban cannot stand unless the answer is "Yes" or "It's ambiguous."

Mathematically, a per-click lease can be expressed as $Y = R \cdot X$, with Y as the physician's total rental income, R as the charge per patient and X as the number of patients served. The term "rental charges" in subsection (iv) can have two meanings. On the one hand, "rental charges" may refer to the variable Y. If "rental charges" means "rental income," then per-click leases do not qualify for the equipment exception. A per-click lease would "take[] into account the volume" of referrals because the physician's rental income would depend directly on the number of patients he refers. On the other hand, "rental charges" may refer to the variable R in the equation above (*i.e.*, the per-patient rate). If a per-click lease charges a flat per-patient rate over the term of the lease, it does not "take into account the volume" of referrals and is therefore eligible for the equipment exception.

But if a per-click lease adopts a tiered system—*e.g.*, $1,000 for the first 20 patients, $2,000 for the next 20 patients, $3,000 for the next 20 patients, and so on—it would not qualify. Because the text of the equipment exception is "reasonably susceptible" to either of these interpretations, it is ambiguous. *McCreary v. Offner*, 172 F.3d 76, 82 (D.C. Cir. 1999).[1]

If the text is ambiguous, we do not automatically move to *Chevron* Step Two. Instead, "a statute may foreclose an agency's preferred interpretation . . . if its structure, *legislative history*, or purpose makes clear what its text leaves opaque." *Catawba Cnty., NC v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (emphasis added); *see also Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008) ("Although *Chevron* step one analysis begins with the statute's text, the court must . . . *exhaust* the traditional tools of statutory construction, including examining the statute's legislative history . . . ." (emphasis added) (quotation marks omitted)); *Am. Bankers Ass'n v. NCUA*, 271 F.3d 262, 268, 271 (D.C. Cir. 2001) (finding text ambiguous but resolving case at *Chevron* Step One due to "pellucid" legislative history). In *Chevron* itself, the Supreme Court did not stop once it found the text ambiguous; it marched on to consider the legislative history as well. *See* 467 U.S. at 862; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 147 (2000) (legislative history is "certainly relevant" at *Chevron* Step

---

[1] Nevertheless, the latter interpretation is plainly the stronger one. The word "charge" means "expense," "cost," or the "price required or demanded for service rendered." *Charge*, III OXFORD ENGLISH DICTIONARY 36 (2d ed. 1989); *see also* MCGRAW–HILL ESSENTIAL DICTIONARY OF HEALTH CARE 159 (1988) ("charge" means the "price assigned to a unit of medical service"). It more naturally refers to the rental rate *charged* to the lessee, not the rental income *earned* by the lessor.

One); *PBGC v. LTV Corp.*, 496 U.S. 633, 649 (1990) ("legislative history" is one of the "traditional tools of statutory construction" at *Chevron* Step One).

Much ink has been spilled on the propriety of using legislative history to cloud a clear text under *Chevron*. *See, e.g.*, *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 90 (2007); *id.* at 105–06 & n.2 (Stevens, J., concurring); *id.* at 108 (Scalia, J., dissenting); *see also Halbig v. Burwell*, 758 F.3d 390, 406 (D.C. Cir. 2014) (identifying "a fork in our precedent" on this issue), *reh'g* en banc *granted, judgment vacated*, No. 14-5018, 2014 WL 4627181 (D.C. Cir. Sept. 4, 2014). But the converse—consulting legislative history to *clarify* an *ambiguous* text—ought to be uncontroversial. The chief objection to legislative history is that it can be undemocratic: the Congress *qua* Congress approves only the text of a statute and the legislative history might reflect a distinctly minority view. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). In the *Chevron* context, however, a failure to consult legislative history would leave the text ambiguous and thereby transfer authority to an *administrative agency*, whose democratic accountability is nil. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 499 (2010) ("The growth of the Executive Branch . . . heightens the concern that it may slip from the Executive's control, and thus from that of the people."). And at least some types of legislative history "shed a reliable light on" the views of a majority of the enacting Congress. *Allapattah Servs.*, 545 U.S. at 568; *see also Simpson v. United States*, 435 U.S. 6, 17 (1978) (Rehnquist, J., dissenting) ("[S]ome types of legislative history are substantially more reliable than others. The report of a joint conference committee of both Houses of Congress, for example, . . . is accorded a good deal more weight than the remarks . . . on the floor of the chamber."). Legislative history is also criticized

for being "murky, ambiguous, and contradictory," an exercise of "looking over a crowd and picking out your friends." *Allapattah Servs.*, 545 U.S. at 568. But again, this criticism loses force under *Chevron*. If legislative history is "ambiguous"—*i.e.*, if both the petitioner and the agency have "friends" they can pick out—then, by definition, the agency prevails under *Chevron* Step One. *See, e.g.*, *Catawba Cnty.*, 571 F.3d at 38. Sometimes, however, the legislative history is clear, reliable and uncontroverted; if it is, we would be wrong to ignore it.

This is one such case. The Conference Report on the 1993 amendments to the Stark Law resolves the textual ambiguity in the equipment exception. According to the Conference Report:

> The conferees intend that charges for . . . equipment leases may be based on daily, monthly, or other time-based rates, or *rates based on units of service furnished*, so long as the amount of the time-based or units of service *rates* does not fluctuate during the contract period based on the volume or value of referrals between the parties to the lease or arrangement.

H.R. REP. NO. 103-213, at 814 (1993) (Conf. Rep.) (emphases added). This legislative history makes clear that the term "rental charges" in subsection (iv) refers to rental "rates," not total rental income. Thus, so long as the per-patient rate is fixed over the course of the lease, a per-click lease qualifies for the equipment exception. The Conference Report could not have been clearer on this point and the CMS has identified nothing to controvert it. Conference reports, moreover, are the gold standard when it comes to legislative history. *See Moore v. Dist. of Columbia*, 907 F.2d 165, 175 (D.C. Cir.

1990) (*en banc*) (unanimous) ("conference committee report is the most persuasive evidence of congressional intent after statutory text" (quotation marks omitted)); *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 657 n.36 (D.C. Cir. 1983) (statements in conference reports are "particularly weighty indicators of congressional intent" because they "represent[] the final word on the final version of a statute" and "must be signed by a majority of both delegations from the House and Senate who have resolved the differences between the two chambers" (quotation marks omitted)).

In short, the Conference Report demonstrates that the "rental charges" in a per-click equipment lease do not "take[] into account the volume . . . of any referrals . . . between the parties." 42 U.S.C. § 1395nn(e)(1)(B)(iv). Per-click leases are therefore eligible for the equipment exception and the CMS lacks the authority to say otherwise.

Contrary to my colleagues, I do not believe the physician group–practice exception reintroduces any ambiguity. That exception requires that a group's "compensation *per unit of services*" not be "determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties." *Id.* § 1395nn(e)(7)(A)(v) (emphasis added). My colleagues contend that the emphasized language shows the Congress "knew how to permit per-click payments explicitly, suggesting that the omission in [the equipment exception] was deliberate." Maj. Op. 15–16. But the group-practice exception speaks only to "compensation" and, thus, does nothing to illuminate the term "rental charges" in the equipment exception. The interpretative value of this wholly separate exception is therefore minimal. *See Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996) (discounting this canon of

statutory construction when "the subject-matter to which the words refer is not the same" (quoting *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932))); *see also United States v. Wells Fargo Bank*, 485 U.S. 351, 357 (1988) ("We cannot attribute to Congress an intent . . . by comparing two unrelated provisions of the [statute]."). More importantly, the Conference Report speaks *directly* to the equipment exception and uses the exact language my colleagues believe is missing: "unit[] of service[s]." H.R. REP. NO. 103-213, at 814. In my view, this crystalline legislative history supersedes whatever oblique inference is attempted to be teased out of a distinct exception in the Stark Law. *See United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1184 (6th Cir. 1982) ("conference report" can rebut "presumption" that "a difference in language reflects a difference in meaning" (citing *Moore v. Harris*, 623 F.2d 908, 914 (4th Cir. 1980)); *see also Neuberger v. CIR*, 311 U.S. 83, 88 (1940) ("The maxim 'expressio unius est exclusio alterius' . . . can never override clear and contrary evidences of Congressional intent."). As this Court has explained before, the argument that the "Congress knows how to say thus and so, and would have written thus and so if that is what it really intended" is "weak." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003). "It may be countered by arguing that if Congress wanted to *exclude* [per-click leases] from the [equipment exception] it easily could have said as much." *Id.* (emphasis added). The text's "failure to speak with clarity signifies only that there is room for disagreement," *id.*—disagreement that, here, the legislative history resolves.

My colleagues minimize the Conference Report because it "states only that rental charges '*may*' be based on units of service." Maj. Op. 17 (emphasis added). This Court has repeatedly held, however, that the Congress need not speak in obligatory terms to constrain an agency's discretion. *See Ry.*

*Labor Execs.' Ass'n*, 29 F.3d at 671 ("To suggest . . . that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent." (emphasis in original)); *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1059–60 (D.C. Cir. 1995) (rejecting argument that "Congress's use of the word 'may'" gives agency unbridled discretion and noting that "[w]e refuse . . . to presume a delegation of power merely because Congress has not expressly withheld such power"). Otherwise, "agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Michigan v. EPA*, 268 F.3d 1075, 1082 (D.C. Cir. 2001). Here, the Congress said that an equipment lease "may" charge a per-click rate; the CMS is therefore not free to say it "may not."

My colleagues also note that "*the text* of the Stark Law makes no reference to per-click rates." Maj. Op. 14 (emphasis added). But this is just another way of saying that legislative history is irrelevant at *Chevron* Step One. It assumes that legislative history cannot disambiguate the meaning of the text itself—an assumption that runs contrary to precedent. *See supra* pp. 6–7; *see also, e.g.*, *Cohen v. United States*, 650 F.3d 717, 730 (D.C. Cir. 2011) (*en banc*) (consulting "single paragraph" of "surprisingly straightforward" legislative history to determine meaning of "intrinsically ambiguous" text); *Elec. Indus. Ass'n Consumer Elecs. Grp. v. FCC*, 636 F.2d 689, 696 (D.C. Cir. 1980) (finding legislative history that "limited the [agency's] power"). It also blinks reality. The Congress often uses legislative history, rather than the text, to restrain agencies in the exercise of their delegated authority. *See* Abbe R. Gluck

& Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 STAN. L. REV. 901, 965–78 (2013).   Here, for example, the CMS felt completely bound by the Conference Report in 2001, *see* Maj. Op. 19–20, and viewed the Conference Report as a substantial hurdle to be overcome in 2008, *see* 73 Fed. Reg. at 48,715 ("we agree that Congress specifically intended to permit certain per-click leases").   This Court likewise consulted legislative history in *Financial Planning Association*, 482 F.3d at 488–90 & n.6—the case my colleagues cite for their text-only proposition.   *See* Maj. Op. 14.

In sum, the Conference Report demonstrates that the Congress addressed per-click leases with a "level of specificity" that "effectively close[d] any gap the Agency s[ought] to find and fill."   *Ethyl Corp.*, 51 F.3d at 1060. Because subsection (iv) sanctions per-click leases, the per-click ban is not an "other" requirement the CMS can promulgate under subsection (vi).   "[A]gencies whose jurisdictional boundaries are defined in the statute [cannot] alter by administrative regulation those very jurisdictional boundaries.   To suggest otherwise is to sanction administrative autonomy beyond the control of either Congress or the courts."   *Am. Bankers Ass'n*, 804 F.2d at 754.   The CMS's ban on per-click equipment leases therefore fails at *Chevron* Step One.   Because my colleagues hold otherwise, I respectfully dissent on this issue.

1

GRIFFITH, *Circuit Judge*, dissenting in part: The majority holds that the per-click rule fails at *Chevron* step two because the Secretary's discussion of the legislative history is unreasonable. The Conference Report states that "[t]he conferees intend that charges for space and equipment leases may be based on . . . rates based on units-of-service furnished, so long as the amount of the . . . units-of-service rates does not fluctuate during the contract period based on the volume or value of referrals between the parties to the lease or arrangement." H.R. REP. NO. 103-213 at 814. In the rulemaking, the Secretary responded to comments that pointed to this legislative history and agreed that it showed that "Congress specifically intended to permit certain per-click leases," however, she "disagree[d] that Congress intended an unqualified exception for per-click leases." 73 Fed. Reg. at 48,715. The Secretary reached this conclusion by adopting a reading of the legislative history that did not prohibit her from banning per-click leases:

> Where the total amount of rent (that is, the rental charges) over the term of the lease is directly affected by the number of patients referred by one party to the others, those rental charges can arguably be said to "take into account" or "fluctuate during the contract period based on" the volume or value of referrals between the parties.

*Id*. at 48,716. Thus, under the Secretary's reading during rulemaking, the legislative history could be read to preclude per-click leases because the total amount paid to the lessor depends on the number of uses of the equipment, even if the per-click rate itself does not. On appeal, however, the Secretary has pressed a different view of the legislative history. Here, she has argued that "the legislative history invoked by the Council does not speak at all to the scope of the Secretary's . . . power to add 'other requirements' to the equipment rental exception. . . . It is thus beside the point

whatever light the legislative history might shed on [the rental-charge clause]." Appellee's Br. 28.

The majority insists that the Secretary cannot rely on the reasoning she has put forth on appeal because it was not set out in the rulemaking and *Chenery* therefore bars us from considering it now. Although the Council raised the *Chenery* argument before the district court, *see* Pl.'s Rep. in Supp. of Mot. for Sum. J. (Dkt. 32) at 2-4, it has not pursued the point on appeal. The majority cites an excerpt from the Council's reply brief that it argues "implicitly" raises the issue. Generally, we do not consider arguments raised for the first time in a reply brief. *See Russell v. Harman Int'l Indus., Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014). The majority contends that looking to the reply brief here is not problematic because the Council did not need to raise *Chenery* in its opening brief before it knew the Secretary's litigation strategy. But the majority ignores the fact that this appeal comes to us from the district court, where the Secretary relied on the same rationale she does here and the Council disputed her reasoning based on *Chenery*. The Council was therefore well aware of the Secretary's litigating position and should have raised *Chenery* as a basis for overturning the district court in its opening brief. *See Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond.").

In any event, the excerpted language does not raise a *Chenery* argument, implicitly or otherwise. It states only that the Secretary has not defended the interpretation of the legislative history that was set forth in the rulemaking. *See* Appellant's Reply Br. 10. This is entirely different from an

argument that the Secretary's current analysis was not raised in the rulemaking—the argument that "implicitly raised the *Chenery* issue" in the case on which the majority relies. *Mitchell v. Christopher*, 996 F.2d 375, 378 n.2 (D.C. Cir. 1993). The majority's strained reading of the brief is especially suspect given the clarity with which the Council raised the *Chenery* argument before the district court. *See* Pl.'s Rep. in Supp. of Mot. for Sum. J. (Dkt. 32) at 2-4. By sua sponte considering an argument the Council has elected to omit from either its opening or reply brief, the majority remands a federal regulation based on an argument not before this court—an action at odds with our precedent. *See, e.g.*, *Doe by Fein v. District of Columbia*, 93 F.3d 861, 875 n.14 (D.C. Cir. 1996) (holding that the appellant waived an argument not raised on appeal). *Cf. Byers v. C.I.R.*, 740 F.3d 668, 681 (D.C. Cir. 2014) (refusing to consider a *Chenery* argument where the appellant failed to pursue the claim in the court below); *see also Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1288-92 (10th Cir. 2007) (McConnell, J. concurring in part and dissenting in part) (arguing that the majority's consideration of *Chenery* claims not raised on appeal "violates well-established principles of appellate review"). The Council is a sophisticated litigant, represented by attorneys familiar with the appellate process. We cannot know why it chose not to bring this particular challenge on appeal, and we should not address what is not before us.

If the argument were properly before us, I would be inclined to agree that the Secretary's interpretation of the legislative history in the rulemaking was unreasonable. But that approach is foreclosed because the Council has declined to raise the *Chenery* argument on appeal. I find the arguments the Council actually briefed at *Chevron* step two unpersuasive, and would thus uphold the per-click rule based

on the Secretary's reasoning on appeal. On those grounds, I respectfully dissent.